Michael Patrick Doyle (*Pro Hac Vice* pending)
Jeffrey Avery (Cal Bar No. 286873)
**DOYLE RAIZNER LLP**
2402 Dunlavy Street
Houston, Texas 77006
Phone:  713.571.1146
Fax:  713.571.1148
Service@doyleraizner.com
*Attorneys for Plaintiffs*

MASTAGNI HOLSTEDT, PC
1912 I Street
Sacramento, CA 95811
Phone: 877.212.6907
Fax: 916.447.4614

## IN THE UNITED STATES DISTRICT COURT
### IN AND FOR THE CENTRAL DISTRICT OF CALIFORNIA
### EASTERN DIVISION

| | |
|---|---|
| JOHN BLACK, VICTOR GREGORY, THOMAS STEPHENSON, JACOB HUBER, CARLA MCCULLOUGH, TIM BRAYSHAW, DUSTIN FUJIWARA, JOSEPH VIOLA, JUSTIN VELOZ, GEOFFREY BARRETT, BRIAN PARK, RUSSELL THURMAN, BOYD MAYO, and VERNELL ROSS-MULLIN,<br><br>                    Plaintiffs,<br><br>v.<br><br>CORVEL ENTERPRISE INC.; YORK RISK SERVICES GROUP, INC.; TANYA MULLINS; PAULA FANTULIN; BRITNEY FAITH; and MEXTLI HYDE,<br><br>                    Defendants. | Case No._____<br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiffs, John Black, Victor Gregory, Thomas Stephenson, Jacob Huber, Carla McCullough, Tim Brayshaw, Dustin Fujiwara, Joseph Viola, Justin Veloz, Geoffrey Barrett, Brian Park, Russell Thurman, Boyd Mayo, and Vernell Ross-Mullin, (together, "First Responder Plaintiffs", or "Plaintiffs"), by and through their attorney undersigned, and for their complaint against the Defendant, allege as follows:

## I.        FACTUAL OVERVIEW OF THE CASE

1.     Firefighters and Police Officers routinely put their lives on the line to protect the citizens of their community, believing that they will not be abandoned if wounded or injured in the line of duty.  The municipalities and those entrusted with the responsibility for responding to on the job injuries to their employees by the municipalities, have a moral and legal obligation to timely and responsibly meet the medical and basic living expenses of first responders who are injured while serving in the line of duty.  An on the job injury to these public servants should not result in medical conditions worsened by delay and denial of necessary care, nor should it leave the first responder, or her family, financially battered and emotionally drained.

2.     Those entrusted with caring for the needs of injured first responders bear a clear responsibility to do so in a supportive manner, and not to create obstacles bound to worsen the physical and financial conditions of these valiant men and women.  This case is based upon a long term and ongoing scheme to delay and deny timely payment of critically needed workers' compensation medical and other payments owed to legitimately injured first responders of the City of Rialto ("Rialto") and the City of Stockton ("Stockton").  CorVel Enterprises Inc., ("CorVel") and York Risk Services Group ("York") are each well aware of these critical needs.  Instead of carrying out the duties consistent with these legal and moral obligations, CorVel and York routinely and improperly choose to hurl frivolous and legally unsound roadblock after roadblock to wrongfully deny care to Rialto and Stockton's first responders, with the assistance of some Rialto and Stockton administrators. As a result, injured first responders, and their families, endure significant delays in medical care, often severe financial distress, and

deleterious impacts on their ultimate physical and financial condition.  After being hurt on the job, these first responder Plaintiffs, and others, have been met with abuse and worry, rather than the basic medical care and living expenses so necessary after an on the job injury.  This misconduct, and its impact on first responders, has been the subject of grand jury investigation and report, with no significant change in the financially motivated misbehavior at the expense of these First Responder Plaintiffs and others.

## II.   THE CITY OF RIALTO

3.     The city of Rialto is self-insured for Workers' Compensation. Rialto also purchases excess insurance coverage for workers' compensation claims through the California State Association of Counties – Excess Insurance Authority ("CSAC-EIA").

4.     Initially, Rialto contracted with Gregory B. Bragg & Associates to administer claims for workers' compensation by Rialto employees. In July 2008, York Risk Services purchased Gregory B. Bragg & Associates including its liabilities and contracts. York then hired adjuster Mextli Hyde to adjust the Rialto workers' compensation claims. York, Hyde, and Rialto consistently delayed and denied coverage for work-related injuries and instead forced injured workers through every possible barrier in an attempt to discourage workers' compensation claims. In June 2011, Rialto subsequently contracted with CorVel for both third party administration and bill review. CorVel hired Mextli Hyde and continued to delay and deny Plaintiffs' claims through roadblock after roadblock. Rialto paid CorVel and York based on a flat fee per claim and a percentage of savings of utilization and bill review, creating a clear incentive for improper conduct when abused.

5.     York, CorVel, and Rialto engaged in a pattern of fraudulently denying and delaying legitimate claims in order to lower the liability of the city, while at the same time maximizing the TPA's revenues (and allowing the TPA to maintain and obtain contracts with other public entities based on their "outstanding" financial performance at the expense of public servants). Upon information and belief, the fraud was accomplished

through the following:

    a.  Rialto, York, and CorVel denied claims in order to push the benefits to each Plaintiff's private insurance, which allowed Defendants to restructure its debt obligations, impose co-pays on the Plaintiffs, direct or limit care, arbitrarily negotiate fees with providers, and increase bill review fees.

    b.  Rialto, York, and CorVel also systematically denied claims to limit the benefits and treatment sought by injured workers, by effectively driving them to abandon legitimate injury claims by a sheer mass of improper obstacles. For example, Defendants denied claims in hopes that some Plaintiffs will simply abandon efforts to seek benefits under workers' compensation for legitimate injuries. Indeed, York, CorVel, and Rialto knew that if a Rialto First Responder received medical coverage under his or her own health insurance the injured worker would be less likely to continue his claim for workers' compensation if CorVel or York had denied the claim. In addition, the denials limited the care sought by Plaintiffs who filed workers' compensation claims benefits during the denial period because Plaintiffs were less likely to seek medical treatment paid if the claimant had to pay the expenses out-of-pocket.

    c.  Rialto, York, and CorVel ignored California law regarding coverage for pre-existing injuries aggravated by a new incident and ignoring the presumption of coverage under California law for Peace Officers. *See e.g.* Labor Code Section § 3212.1 (Cancer); § 3212 (Hernia, heart injuries, and pneumonia); and § 3213.2 (lower back).

    d.  Rialto, York, and CorVel ignored treating physicians and instead delayed and denied claims until the injured workers attended either an Agreed Medical Examination ("AME") or a Qualified Medical Examination ("QME"), regardless if the claim was compensable and an AME or QME was necessitated by a fair review of the facts presented by treating doctors.

    e.  Rialto, York, and CorVel placed frivolous hurdles in front of claimants in

order to delay benefits and postpone exposure for claims. Rialto, York, and CorVel also used the process improperly to dispute claims it knew were compensable despite no reasonable basis to dispute the claims – effectively delaying benefits for years through the backlogged Court system.

6.     In sum, Rialto, York, and CorVel were financially motivated to deny legitimate claims, and Defendants did just that. The San Bernardino County Grand Jury even investigated York and Rialto's claims handling of workers' compensation system for Rialto Police Department employees, confirming improper conduct.  *See* Exhibit "1," San Bernardino County Grand Jury Report.  On September 30, 2010, the Grand Jury reported that York had improperly delayed and denied claims that should have been timely paid. Specifically the Grand Jury found that "a review of officer injury claim files indicate that the City has failed to approve, in a timely manner, continuing and follow-up treatment or therapy for claimants." Id. The Grand Jury then concluded that Rialto and York must "[p]rovide medical services immediately to prevent further injury and to shorten off duty time." Id. Unfortunately, the report did not lead to a significant change in the improper practices confirmed by the investigating Grand Jury.

7.     But even after Rialto contracted with CorVel, CorVel, Hyde, and Rialto continued York's fraudulent denials and instead motivated its adjuster to deny valid claims like the Plaintiffs.  Indeed, Rialto, CorVel, and York created a pattern and practice of delaying legitimate claims in order to benefit the city and the TPAs. For example, CorVel and Rialto maintained a claim closing ratio of 100%, reduced the amount Rialto paid per year on claim management by $365,000, reduced open claim incurred valued by $955,000.00, reduced total lost time days over 100%, and delayed reimbursing injured workers for out-of-pocket expenses.  Moreover, CorVel and Rialto's denials lowered the total paid $251,979.00 in CorVel's first full year of service to the city and an additional $384,754.00 the following year. Finally, total lost time days were reduced 33% (from 5,400 days to 3,599) in the CorVel's year and an additional 51% reduction (from 3,599 to 1,746 lost days) in the 2012-2013 fiscal year. This pattern of systematic delays is

illustrated by conduct involved in handling of the Plaintiff's claims in this case.

### III.   THE CITY OF STOCKTON

8.      Similar to Rialto, the City of Stockton has maintained self-insurance for Workers' Compensation since 1979, under California Certificate Number 7147. Stockton also purchases excess insurance coverage for workers' compensation claims through the California State Association of Counties – Excess Insurance Authority ("CSAC-EIA"). Stockton maintains a $500,000.00 per claim self-insured retention for its workers' compensation claims. Thus the first $500,000.00 owed for benefits of each injury claim is owed directly by the City of Stockton.

9.      Initially, Stockton contracted with Gregory B. Bragg & Associates to administer claims for workers' compensation by Rialto employees. In July 2008, York Risk Services purchased Gregory B. Bragg & Associates including its liabilities and contracts.  In October 2010, Stockton then contracted with CorVel for to adjust claims for workers' compensation for the city of Stockton employees.  CorVel then hired York's former adjusters to adjust the Stockton's workers' compensation claims. York, CorVel and Stockton consistently delayed and denied coverage for work-related injuries and instead forced injured workers through every possible barrier in an attempt to discourage workers' compensation claims. Stockton paid CorVel and York based on a flat fee per claim and a percentage of savings of utilization and bill review.

10.     CorVel, York, and Stockton engaged in a pattern of fraudulently denying and delaying legitimate claims in order to lower the liability of the city, while at the same time maximizing CorVel's revenues.  This fraud was accomplished through the following:

a.  Stockton, York, and CorVel denied claims in order to push the benefits to each Plaintiff's private health insurance, which allowed Defendants to restructure its debt obligations, receive credit for co-pays from the Plaintiffs personal funds, direct or limit care, negotiate payments from providers without regard to existing obligations, and increase bill review fees.

b.  Stockton, York, and CorVel also systematically denied claims to limit the

benefits and treatment sought by injured workers, by effectively driving them to abandon legitimate injury claims by a sheer mass of improper obstacles For example, Defendants denied claims in hopes that some Plaintiffs will simply not continue to seek benefits under workers' compensation entirely. Indeed, Defendants knew that if a Plaintiff received medical coverage on his own insurance, the injured worker would be less likely to continue his claim for workers' compensation if had been denied.  In addition, the fraud limited the care sought by Plaintiffs who filed workers' compensation claims benefits during the denial period.

c. Stockton, York, and CorVel ignored California law regarding coverage for pre-existing injuries aggravated by a new incident and ignoring injuries presumed covered under California law. *See e.g.* Labor Code Section § 3212.1 (Cancer); § 3212 (Hernia, heart injuries, and pneumonia); and § 3213.2 (lower back).

d. Stockton, York, and CorVel regularly and routinely ignored treating physicians, instead delayed and denied claims until the injured workers attended either an Agreed Medical Examination ("AME") or a Qualified Medical Examination ("QME"), whether reasonable, necessary, or consistent with their obligations to their injured employees to confirm timely medical and other benefits.

e. Stockton, York, and CorVel placed frivolous hurdles in front of claimants in order to delay benefits and postpone exposure for claims to future years. Stockton, York, and CorVel then used the process improperly to dispute claims it knew were compensable despite no reasonable basis to dispute the claims – effectively delaying benefits for years through the backlogged Court system.

11.    For example, in order to induce plaintiffs into employment as police officers for the city of Stockton, Stockton represented to the Stockton Plaintiffs that each Plaintiff's on-the-job injuries would be covered under Stockton's workers' compensation insurance. And Stockton continually represented that on-the-job injuries would be covered

under its workers' compensation plan. Stockton even expressly stated that most workers' compensation claims were handled routinely, as long as Plaintiff's treating doctor correlated the injury to the on-the-job event and placed the injured employee off-work. Defendants' factual representations were further documented in the Stockton Workers' Compensation Handbook.

> All injuries, regardless of severity, are covered if they are caused by your job.
> . . .
> If your claim is accepted as compensable, Workers' Compensation Law provides for lost wages in the form of temporary disability. **These payments may be provided as long as the treating doctor says you are unable to work, and you are off work for more than three days.** There may be further payments provided after you return to work if the doctor indicates you have permanent restrictions.
> . . .
> Most job injury claims are handled routinely as the benefits are set by the Legislature. If you feel you have not received all benefits due you, contact City Risk Services or the TPA.

*See* Exhibit "2," "Stockton Workers' Compensation Handbook."

12.     But when each Plaintiff suffered injuries on-the-job, York, CorVel, and Stockton consistently delayed payment of medical and disability benefits.  In addition, Defendants refused to accept Plaintiffs' treating physicians' reports and instead issued denials (and delays) of benefits.  York, CorVel, and Stockton then forced Plaintiffs through a pattern of road blocks, which forced them to pay for their own medical benefits and substantially delayed income benefits.

13.     To further add insult to injury, during the late 2000s, the city also faced financial crisis because of substantially increasing retirements costs, downtown revitalization effort, falling property-tax revenues, and drastically increasing workers' compensation costs. After years of financial struggle, the city of Stockton filed for Bankruptcy protection in 2012.

14.     Because workers' compensation benefits are a protected statutory rights (and bankruptcy would expose Stockton to excessive penalties and litigation), Stockton

could not restructure its substantial workers' compensation debt through bankruptcy. Rather than restructuring benefits (like Stockton did with welfare benefits plans and health care costs), Stockton instead looked "to other means to control what is spent on its workers' compensation program." In fact, the City put out the following statement when reviewing CorVel's performance:

> Unlike an employer sponsored health benefit program that allows freedom to structure benefit levels, benefit levels in the worker's compensation system are fixed by statute and regulation and employers must abide by these guidelines in paying medical and indemnity benefits.
> . . .
> The City has historically funded the Workers Compensation Program on the basis of actual claim expenditures in any given year. During periods of fiscal crisis any excess or remaining funds were used to fill other gaps and, therefore, no fund reserve has been allowed to accumulate. Similar to pension or health plan reserves, the Workers Compensation Program should accumulate reserves equal to total claim values in order to be considered fully funded since claims may develop and accrue costs over a period of years. The current present value of estimated outstanding losses for existing claims is just over $57 Million, of which approximately $42 Million is unfunded according to the most recent actuarial report.
> . . .
> In summary, with rising indemnity and medical costs and an inability to restructure statutory benefit obligations, **the City must look to other means to control what is spent on its workers' compensation program**.

*See* Exhibit "3," Stockton's Issuance of Request for Proposal, dated March 19, 2013.

15.   In sum, as a direct result of the increasing costs (and because the workers' compensation fund was $42 million in the red), Stockton, CorVel, and York systematically delayed and denied coverage for workers' compensation injuries to lower workers' compensation funds.  For example, Stockton, CorVel, and York were aware that Stockton maintained a high percentage of open claims. In fact, a benchmark study showed that Stockton's open/close claims ratio was substantially higher than similar cities. Moreover, Defendants knew that nearly $42 million of the open claims inventory remained unfunded. To lower Stockton's exposure, Stockton, CorVel, and York

artificially decreased the open claims ratio by closing (or denying) claims such as Plaintiffs without an investigation of the individual facts of each case. These delays and denials resulted in substantial fiscal relief for Stockton by shifting medical costs to outside medical providers and delaying claims exposure for income benefits for years.

## IV.   ADDITIONAL SPECIFIC DETAILS REGARDING EACH PLAINTIFF

16.    Plaintiffs file this lawsuit within the applicable limitations period of first suspecting that Defendants caused the harm sustained by Plaintiffs, within the applicable limitations period of first suspecting or having reason to suspect any wrongdoing, and within the applicable limitations period of first discovering the injuries the nature of the Plaintiffs' injuries and their relationship to Defendants' misconduct was inherently undiscoverable, and consequently, the discovery rule should be applied to toll the running of the statute of limitations until Plaintiffs knew, or through the exercise of reasonable care and diligence, should have known of the existence of their claims against Defendants. Plaintiffs did not discover, and through the exercise of reasonable care and due diligence, could not have discovered, their injuries earlier. Further, Plaintiffs did not have knowledge of facts that would lead a reasonable, prudent person to make inquiry to discover Defendants' tortious conduct. Under appropriate application of the discovery rule, Plaintiffs' suit was filed well within the applicable statutory limitations period.

17.    Defendants are estopped from asserting a statute of limitations defense because they fraudulently concealed from Plaintiffs the nature of Plaintiffs' injuries and the connection between the injury and Defendants.

### What Defendants Did to Police Officer Russell Thurman

18.    Russell Thurman worked as a homicide detective for the City of Stockton Police Department. During his 18 years serving the people of Stockton, Mr. Thurman sustained multiple injuries that were consistently delayed and denied by York, Stockton, and CorVel, despite Defendants' promises that Mr. Thurman's on-the-job injuries would be covered by Stockton's workers' compensation.

19.    First on December 31, 2008, Mr. Thurman suffered an injury to his cervical

and lumbar spine.  Next, on June 11, 2009, while pursuing a suspect, Mr. Thurman kicked down the front door of a residence and injured his lower back. Finally, while doing surveillance work, Mr. Thurman again injured his back when forced to jump out of a moving vehicle Mr.  Thurman properly reported these injuries and sought treatment from Dr. Sepiol. Dr. Sepiol diagnosed Thurman with an injury to his lumbar spine.

20.     Because Mr. Thurman worked as a peace officer, a presumption of coverage existed for his lower back injury.[1] In addition, under California law an employer "takes an employee as it finds her or him." Thus if a disability results from the acceleration, aggravation, or "lighting up" of a pre-existing condition, the employer is required to compensate for the entire disability even though the injury might have caused little or no disability in a healthier person. *See e.g. Reynolds Elec., etc., Co. v. Workmen's Comp. App. Bd.*, supra, 65 Cal.2d 438, 442-443 (1967) ("It is well settled that the acceleration, aggravation, or 'lighting up' of a preexisting non-disabling condition is an injury in the employment causing it . . .") Therefore to the extent that Mr. Thurman's injury aggravated a prior condition, the claim was clearly compensable. Mr. Thurman provided testimony, medical records, medical opinions, and other evidence to Defendants and Stockton establishing his right to worker's compensation benefits

21.     Despite Defendants promises to accept treating physician's opinions, on November 5, 2009, Tanya Mullins, an adjuster working for York sent a notice of denial through the United States Mail denying all medical treatment for his on the job injury. Ms. Mullins alleged, falsely that the claim was not compensable because there was a lack of sufficient medical evidence to establish industrial causation. This denial was a fraudulent communication because York knew that Mr. Thurman was injured while at work, sought treatment for this injury, Dr. Sepiol confirmed his need for treatment, and York had no valid basis for denying the claim.  This claim is clearly compensable under California law.

---

[1] See California Labor Code § 3213.2. Lower back impairments; law enforcement personnel ("The lower back impairment so developing or manifesting itself in the peace officer shall be presumed to arise out of and in the course of the employment. This presumption is disputable and may be controverted by other evidence, but unless so controverted, the appeals board is bound to find in accordance with it.")

Instead, York and Stockton denied the claim in order to push insurance coverage for Mr. Thurman's treatment to his own healthcare through Stockton, which allowed Stockton to assist in their efforts to restructure the debt obligations, receive co-pays from Mr. Thurman, and direct or limit Mr. Thurman's care. Defendants also denied the claim in order to create a lulling affect and in the hopes that Mr. Thurman would no longer seek workers' compensation benefits. In addition, York refused to follow the requests of Mr. Thurman's treating physicians, and instead delayed the claim for years to lower its obligations for workers' compensation payments.

22.     In addition to his back injuries, while working for the Police Department, Mr. Thurman was consistently exposed to harmful exposure from the sun that resulted in skin cancer.  Under California Labor Code Section 3212.1, a presumption of coverage for cancer exists for peace officers[2].  Mr. Thurman received treatment for his skin cancer including several procedures from Dr. Abdallah Khourdaji.  On August 18, 2011, Mr. Thurman requested coverage under workers' compensation for his treatment and impairment. Mr. Thurman presented testimony, medical records, medical opinions, and other evidence establishing his right to worker's compensation benefits.

23.     On November 1, 2011, Paula Fantulin, an a senior adjuster for Corvel, filed a notice regarding denial  of workers' compensation benefits through the United States Mail denying medical treatment and payments for his on the job injury.  This denial was a fraudulent communication because CorVel knew Mr. Thurman suffered skin cancer, knew Mr. Thurman had been constantly exposed to the sun during his employment with Stockton, knew that under California law a presumption of coverage existed for peace officers, and had no evidence the claim was not covered.  This claim is and was always clearly compensable under California law. Instead, CorVel denied the claim in order to push insurance coverage for Mr. Thurman's cancer treatment to his own healthcare through Stockton, which improperly assisted Stockton's efforts to restructure the debt

---

[2]See California Labor Code § 3212.1 ("The cancer so developing or manifesting itself in these cases shall be presumed to arise out of and in the course of the employment.")

obligations, receive co-pays from Mr. Thurman, direct Mr. Thurman's care, and increase bill review fees. Defendants also denied the claim in an attempt to create so many obstacles that Mr. Thurman would be discouraged from seeking workers' compensation benefits. In addition, CorVel refused to follow the requests of Mr. Thurman's treating physicians, and instead delayed the claim for two years to improperly attempt to lower its obligations for workers' compensation payments.

24.    Without a valid reason, CorVel then forced Mr. Thurman to attend three separate Qualified Medical Examinations ("QME") with Dr. Stephen P. Abelow on January 21, 2010, July 22, 2011 and January 16, 2012.  Through the QME process, Dr. Abelow confirmed that Mr. Thurman suffered injuries to his back and required disability payments. In addition, despite the presumption of cancer coverage, CorVel also forced Mr. Thurman to attend an additional QME with Dr. Scott Anderson on May 7, 2012. Dr. Anderson also confirmed that Mr. Thurman's injuries were industrial and he found that Mr. Thurman had a 35% impairment of the whole person.

25.    Despite the presumption of coverage, clear supporting evidence of the injury and supporting medical evidence by Mr. Thurman's treating physicians and QME doctors, CorVel still refused to provide benefits and initiated hearings before the WCAB.  Not surprisingly, but only after the long delay caused by York and Corvel's improper denials, on July 24, 2013, CorVel finally agreed to accept Mr. Thurman's claim for all of his claims.  Unfortunately, Defendants delay in payment of benefits and medical care caused separate and distinct physical and financial damage to Mr. Thurman. Defendants' fraudulent communication with Mr. Thurman and his providers was accomplished solely through emails, facsimile, the United States Mail, or telecommunication.

26.    Mr. Thurman relied on the fraudulent communication because he suffered financial loss including attorney's fees, medical care, and medical mileage.  Defendants' fraud directly caused injury to Mr. Thurman because it deprived him of benefits and caused him to pay attorney's fees, medical care (including out-of-pocket deductibles, medical mileage and other costs), suffer emotional pain and damages. Moreover,

Defendants delay in financial and medical benefits also caused Thurman to suffer the loss of wages (including overtime) and future earning capacity, miss promotions, and damaged Mr. Thurman's pension expectancy.  Due to the wrongful denial, delay, and scheme Mr. Thurman suffered significant economic damage, humiliation, worry, distress, and continuing economic and physical damage.  Mr. Thurman struggled to sleep at night for months and experienced unnecessary worry, stress, and concern that impacted his daily activities.  Additionally, Mr. Thurman has suffered financial harm and damage to his credit.

### What Defendants did to Police Officer Boyd Mayo

27.     Boyd Mayo worked as a police officer for the City of Stockton for over eight years. While protecting the people of the city of Stockton, Mr. Mayo suffered a series of injuries to his back, knees, and hand while protecting the citizens of the city.

28.     First on May 9, 2009, while jumping over a fence, Mr. Mayo suffered an injury to his right pinky finger. That same day, Mr. Mayo sought treatment for his finger, which was consistently documented. After receiving treatment for his finger, Mr. Mayo's doctor eventually determined Mr. Mayo was stationary and suffered a 2% personal impairment rating from the injury.

29.     Next, on August 1, 2010, Mr. Mayo injured his back during the course of auto patrol. Mr. Mayo felt instant sharp pain and reported the injury. Mr. Mayo sought treatment from Dr. James Sepiol who confirmed his back injury and temporarily took Mr. Mayo off work. Because Mr. Mayo worked as a peace officer, a presumption of coverage existed for his lower back injury. In addition, under California law an employer "takes an employee as it finds her or him." Therefore to the extent that Mr. Mayo's injury aggravated a prior condition, the claim was clearly compensable.

30.     Finally on June 11, 2011, Mr. Mayo was injured while trying to subdue a suspect, causing injuries to his hand and knee.  Dr. Sepiol diagnosed Mr. Mayo with Chondromalacia of his left patella and removed him from full work duties while requiring treatment.

31.     Mr. Mayo presented testimony, medical records, medical opinions, and

other evidence to Stockton and CorVel establishing his right to worker's compensation benefits.

32. Despite Defendants' promises to accept, and not consistently ignore, treating physician's opinions, on October 11, 2012, November 12, 2012, and December 6, 2012, CorVel adjuster Britney Faith sent denials regarding Mr. Mayo's claims for workers' compensation benefits. The denials were sent through the United States Mail denying medical treatment and payments for his on the job injuries. These denials were fraudulent communications because CorVel knew Mr. Mayo suffered injuries to his hand, fingers, knee, and back. Moreover each incident was documented, including the presumption of back injuries for peace officers. The claims are and were always clearly compensable under California law. Rather than make timely payments, CorVel denied the claim in order to push insurance coverage for Mr. Mayo's treatment to his own healthcare through Stockton, which assisted improper efforts by Stockton to restructure the debt obligations, receive co-pays from Mr. Mayo's personal funds, improperly direct or limit Mayo's care, and increase bill review fees. Defendants also denied the claim in order to create a lulling affect in the hopes that Mr. Mayo would no longer seek workers' compensation benefits. In addition, CorVel refused to follow the requests of Mr. Mayo's treating physicians, and instead delayed the claim for years to lower its obligations for workers' compensation payments.

33. Again without justification, CorVel then forced Mr. Mayo to attend an Agreed Medical Examination ("AME") with Dr. Stephen P. Abelow on August 6, 2013, long after Mr. Mayo's initial injuries. Not surprisingly, Dr. Abelow confirmed that Mr. Mayo's injuries were compensable and that he suffered impairment that was compensable under California law. Nearly a year later on June 24, 2014, after the long delay caused by York and Corvel's improper denial, CorVel finally agreed to accept Mr. Mayo's claim through a stipulation filed with the Court. Unfortunately, Defendants delay in payment of benefits and medical care caused separate and distinct physical and financial damage to Mr. Mayo. Defendants' fraudulent communication with Mr. Mayo and his providers was

accomplished solely through emails, facsimile, the United States Mail, or telecommunication.

34.    Mr. Mayo relied on the fraudulent communication because he suffered financial loss including attorney's fees, medical care, and medical mileage. Defendants' fraud directly caused injury to Mr. Mayo because it deprived him of benefits and caused him to pay attorney's fees, medical care (including out-of-pocket deductibles, medical mileage and other costs), and suffer emotional pain and damages. Due to the wrongful denial, delay, and scheme Mr. Mayo suffered significant economic damage, humiliation, worry, distress, and continuing economic and physical damage.  Moreover, Defendants delay in financial and medical benefits also caused Mayo to suffer the loss of wages (including overtime) and future earning capacity, miss promotions, and damaged Mr. Mayo's pension expectancy. Mr. Mayo struggled to sleep at night for months and experienced unnecessary worry, stress, and concern that impacted his daily activities. Additionally, Mr. Mayo has suffered financial harm and damage to his credit.

### **What Defendants Did to Police Detective Vernel Ross-Mullin**

35.    Ms. Ross-Mullin worked as a detective for the Stockton Police Department and on March 16, 2010, she developed anterior chest pain. She was taken by ambulance to the ER and received treatment for her heart injury. Under California Labor Code Section 3212, such cardiac injuries are presumed covered for peace officers.   Dr. James Sepiol diagnosed Ms. Ross-Mullin with Coronary Artery Disease and confirmed the injury was work-related. Ms. Ross- Mullin presented testimony, medical records, medical opinions, and other evidence to Stockton and Defendants establishing his right to worker's compensation benefits.

36.    Despite Defendants promises to accept treating physician's opinions, York sent a notice of delayed payment regarding Ms. Ross-Mullin's claim for workers' compensation benefits. The denials were sent through the United States Mail denying medical treatment and payments for his on the job injuries.  The denials were a fraudulent communications because CorVel knew Ms. Ross-Mullin suffered injuries to her heart.

And CorVel, York, and Stockton knew Ms. Ross-Mullin's injury was presumed to be covered. The claim is and was always clearly compensable under California law. CorVel and Defendants' completely ignored California workers' compensation claw, including the presumption of coverage for heart injuries. Instead, CorVel denied the claim in order to push insurance coverage for Ms. Ross-Mullin's treatment to his own healthcare through Stockton, which improperly assisted efforts of Stockton to restructure the debt obligations, receive co-pays from Mr. Ross-Mullin's personal funds, direct or limit Mr. Ross-Mullin's care, and increase bill review fees. Moreover, Defendants also denied the claim to discourage her from seeking his statutory benefits by throwing down improper obstacles by imposing unnecessary obstacles to overcome. In addition, CorVel, York, and Stockton refused to follow the requests of Ms. Ross-Mullin's treating physicians, and instead delayed the claim for over a year in an improper effort to lower its obligations for workers' compensation payments.

37. Finally, over a year later on August 16, 2011 Stockton and CorVel filed a stipulation covering Ms. Ross-Mullin's injury. In that stipulation CorVel, York, and Stockton agreed to pay "any reasonable unpaid medical-legal expenses, with jurisdiction reserved." Yet despite this delayed benefits, CorVel, York, and Stockton failed to reimburse or pay for medical benefits for Ms. Ross-Mullin Eventually this injury forced Ms. Ross-Mullin to retire from her job. Unfortunately, Defendants delay in payment of benefits and medical care caused separate and distinct physical and financial damage to Ms. Ross-Mullin. Defendants' fraudulent communication with Ms. Ross-Mullin and her providers was accomplished solely through emails, facsimile, the United States Mail, or telecommunication.

38. Ms. Ross-Mullin relied on the fraudulent communication because she suffered financial loss including attorney's fees, medical care, and medical mileage. Defendants' fraud directly caused injury to Plaintiff because it deprived her of benefits and caused her to pay attorney's fees, medical care (including out-of-pocket deductibles, medical mileage and other costs), suffer emotional pain and damages. Due to the wrongful

denial, delay, and scheme Plaintiff suffered significant economic damage, humiliation, worry, distress, and continuing economic and physical damage.   Moreover, Defendants delay in financial and medical benefits also caused Plaintiff to suffer the loss of wages (including overtime) and future earning capacity, miss promotions, and damaged her pension expectancy. Ms. Ross-Mullin struggled to sleep at night for months and experienced unnecessary worry, stress, and concern that impacted his daily activities. Additionally, Ms. Ross-Mullin has suffered financial harm and damage to her credit.

### What Defendants Did to Firefighter Dustin Fujiwara

39.    For 12 years, Dustin Fujiwara worked as a Firefighter and Paramedic for the City of Rialto Fire Department. While working on duty on August 25, 2010, Fujiwara injured his back lifting a patient.  Mr. Fujiwara subsequently completed the filing for a claim for workers' compensation and began receiving physical therapy, as well as an MRI to confirm his injuries.

40.    Mextli Hyde through York Insurance Company sent Fujiwara to Dr. John Steinmann on September 30, 2010.  While doctors are supposed to be unbiased and undirected by a claims company such as York or Rialto, in this case York and Rialto knew full well which doctors will and which will not provide objective evaluations.  York and Rialto chose to have Mr. Fujiwara evaluated by Dr. Steinmann.  Dr. Steinmann not surprisingly claimed a basis to discontinue Mr. Fujiwara's physical therapy and medical benefits for treatment of his injuries.

41.    Mr. Fujiwara then sought treatment from Dr. Chron, who confirmed that Mr. Fujiwara needed treatment before returning to full duty status. Dr. Chron then continued Mr. Fujiwara's physical therapy benefits. Dr. Chron subsequently found that Mr. Fujiwara needed back surgery to treat his injuries, but Mextli Hyde denied authorization on March 24, 2011. This denial was a fraudulent communication because York and Corvel knew that Mr. Fujiwara was injured while at work, sought treatment for this injury, and had no valid basis for denying the claim.   This claim is clearly compensable under California law.   Indeed, a presumption of coverage existed for

Fujiwara's injury. Instead, Defendants denied the claim in order to push insurance coverage for Mr. Fujiwara's treatment to his own health insurance, which assisted improper efforts by Rialto to restructure the debt obligations, receive co-pays from Mr. Fujiwara, direct or limit Mr. Fujiwara's care, and increase bill review fees.  Defendants also denied the claim to create as many obstacles as in the hopes that Mr. Fujiwara would no longer seek workers' compensation benefits. In addition, Defendants refused to follow the requests of Mr. Fujiwara's treating physicians, and instead delayed the claim to lower its obligations for workers' compensation payments.

42.    Without justification, Defendants then forced Mr. Fujiwara to attend a QME with Dr. Wood on May 4, 2011. Not surprisingly, Dr. Wood confirmed that Mr. Fujiwara's injuries were compensable and that he required surgery.  Based on Dr. Wood's report, York and CorVel finally agreed to pay for Mr. Fujiwara's surgery on July 20, 2011.  During Surgery, Dr. Chron further confirmed Mr. Fujiwara's injury to his back.

43.    But even after delaying Mr. Fujiwara's surgery with no basis, Hyde, York, Rialto, and CorVel continually underpaid and failed to reimburse Mr. Fujiwara for his benefits.  Indeed, on September 2, 2011 and June 7, 2012, Mextli Hyde sent letters to Mr. Fujiwara notifying Mr. Fujiwara that his benefits were delayed.  Finally on September 6, 2013, Mr. Fujiwara finally received a stipulation from Defendants confirming his owed benefits. In addition, despite constant emails and calls to Hyde, CorVel and Hyde refused to provide the basis for its denials.  Indeed when questioned regarding the calculations for his workers' compensation benefits, Hyde told Mr. Fujiwara that "per state law she does not have to provide that information."

44.    Unfortunately, Defendants delay in payment of benefits and medical care caused separate and distinct physical and financial damage to Mr. Fujiwara. Defendants' fraudulent communication with Mr. Fujiwara and his providers was accomplished solely through emails, facsimile, the United States Mail, or telecommunication.

45.    As with the other first responders subjected to unjustified and unnecessary delays by York and Corvel, Mr. Fujiwara relied on the fraudulent communication because

he suffered financial loss including attorney's fees, medical care, and medical mileage. Defendants' fraud directly caused injury to Plaintiff because it deprived him of benefits and caused him to pay attorney's fees, medical care (including out-of-pocket deductibles, medical mileage and other costs), suffer emotional pain and damages. Due to the wrongful denial, delay, and scheme Plaintiff suffered significant economic damage, humiliation, worry, distress, and continuing economic and physical damage. Moreover, Defendants delay in financial and medical benefits also caused Plaintiff to suffer the loss of wages (including overtime) and future earning capacity, miss promotions, and damaged his pension expectancy. Additionally, Mr. Fujiwara has suffered financial harm and damage to his credit.

### **What Defendants Did to Firefighter Victor Gregory**

46.     Victor Gregory worked as a Firefighter for the Fire Department for the City of Rialto.  While working on duty on May 5, 2011, Mr. Gregory injured his knee while exercising at the station, confirmed under applicable standards as a workplace injury. Mr. Gregory reported the injury, but continued working.  He later sought treatment for his injured knee and his treating physician, Dr. Daniel Kharrazi, confirmed that Mr. Gregory suffered a torn ACL.

47.     Despite Defendants' promises to accept treating physician's opinions in 2011, CorVel adjuster Mextli Hyde sent a denial regarding Mr. Gregory's claims for workers' compensation benefits. The denial was sent through the United States Mail denying medical treatment and payments for his on the job injuries.  The denials were a fraudulent communications because CorVel knew that Mr. Gregory suffered injuries to his knee.  The claims are and were always clearly compensable under California law. Instead, CorVel denied the claim in order to push insurance coverage for Gregory's treatment to his own health insurance, which improperly assisted Rialto's efforts to restructure the debt obligations, receive co-pays from Mr. Gregory's personal funds, direct or limit Mr. Gregory's care, and increase bill review fees.  Moreover, Defendants also denied Mr. Gregory's claim to discourage him from seeking his statutory benefits by throwing down

improper obstacles.  In addition, CorVel refused to follow the requests of Mr. Gregory's treating physicians, and instead delayed the claim for years to lower its obligations for workers' compensation payments.

48.     Several months later, Mr. Gregory finally received his needed surgery, but CorVel continued to deny payment of the owed indemnity payments for the missed time. Indeed, rather than pay the owed benefits, CorVel attempted to avoid paying the benefits by pressuring Gregory's treating physician and sending a surveillance team to Mr. Gregory's home.  Finally on October 28, 2013, CorVel filed a stipulation to pay Mr. Gregory his owed benefits. Unfortunately, Defendants delay in payment of benefits and medical care caused separate and distinct physical and financial damage to Mr. Gregory. Defendants' fraudulent communication with Mr. Gregory and his providers was accomplished solely through emails, facsimile, the United States Mail, or telecommunication.

49.     Mr. Gregory relied on the fraudulent communication because he suffered financial loss including medical care (including out-of-pocket deductibles, medical mileage and other costs), and medical mileage.  Defendants' fraud directly caused injury to Plaintiff because it deprived him of benefits and caused him to pay for medical care (including out-of-pocket deductibles, medical mileage and other costs), suffer emotional pain and damages. Due to the wrongful denial, delay, and scheme Plaintiff suffered significant economic damage, humiliation, worry, distress, and continuing economic and physical damage. Moreover, Defendants delay in financial and medical benefits also caused Plaintiff to suffer the loss of wages (including overtime) and future earning capacity, miss promotions, and damaged his pension expectancy. Mr. Gregory struggled to sleep at night for months and experienced unnecessary worry, stress, and concern that impacted his daily activities. Additionally, Mr. Gregory has suffered financial harm and damage to his credit.

### What Defendants Did to Police Officer Timothy Brayshaw

50.     Timothy Brayshaw has worked for the police department for the City of

Rialto for over 11 years. While protecting the people of Rialto, Mr. Brayshaw suffered a series of injuries to his while acting in the scope of his employment.

51.     First, between April and August of 2008, Mr. Brayshaw was diagnosed with Clostridium Difficile and Pneumonia by his personal physician, Dr. Shiu. Dr. Shiu confirmed that the injury was work-related under California law.  Indeed, under California Labor Code Section 3212, these injuries are presumed covered for peace officers[3].  On June 3, 2009, Mr. Brayshaw filed a claim for coverage under Rialto's workers' compensation insurance. Mr. Brayshaw provided testimony, medical records, medical opinions, and other evidence to Defendants proving his entitlement for benefits.

52.     On October 8, 2010 claims adjuster Mextli Hyde of York Insurance Services Group was assigned to Mr. Brayshaw's cases and has continued to deny medical treatment recommended by agreed QME physicians.  For example, Ms. Hyde has maintained a hostile attitude toward Brayshaw's claim including improperly discouraging him from seeking coverage for his workers' compensation during phone-calls with Mr. Brayshaw. For example, CorVel and Hyde have failed to reimburse Mr. Brayshaw for needed medications and medical expenses.

53.     Unfortunately, during August of 2013, Officer Brayshaw had a reoccurrence of Clostridium Difficile.  Dr. Zagelbaum's report of September 9, 2013 state Mr. Brayshaw's medical expenses and sick time used were "Industrial Related".  But CorVel and the City of Rialto denied the continuing damage. A second examination by Dr. Green the original QME was completed on February 7, 2014.  Dr. Green's report of February 14, 2014 agrees with Dr. Zagelbaum's report, in that the 2013 reoccurrence of Clostridium Difficile is industrial related. Unfortunately, CorVel continued to deny the claim, even after two separate QME physicians report the injury is industrial related.

54.     Next on June 2, 2011, while on-the-job, Mr. Brayshaw was rear-ended by a driver who fell asleep behind the wheel. As a result of the collision, Mr. Brayshaw

---

[3] California Labor Code § 3212 ("The hernia, heart trouble, or pneumonia so developing or manifesting itself in those cases shall be presumed to arise out of and in the course of the employment.")

suffered a neck, cervical injury and right forearm injury. August 18, 2011, Mr. Brayshaw filed a claim for coverage under Rialto's workers' compensation insurance.

55. Mr. Brayshaw agreed to treat with the City of Rialto and CorVel's orthopedic physician, Dr. Hopkins of Arrowhead Orthopedics, because Hyde personally assured Brayshaw that she was concerned for Mr. Brayshaw's [w]elfare, because neck injuries are so dangerous." Hyde scheduled an MRI on June 29, 2011. At the time, Mr. Brayshaw was experiencing headaches; shooting pain (electric shocks) and numbness to his right shoulder extending to Mr. Brayshaw's right forearm, accompanied by complete loss of use of Mr. Brayshaw's right hand. On July 7, 2011, after the MRI, Mr. Brayshaw returned for a follow-up appointment at St. Bernardine Medical Center, Occupational Health. P.A. Smirl informed Mr. Brayshaw the MRI showed damage to the area of the neck that is associated with the nerves for the right shoulder and forearm. P.A. Smirl then told Mr. Brayshaw the MRI substantiates his injury claim.

56. Dr. Hopkins report of February 22, 2012 and again on September 16, 2012 recommended chiropractic care or physical therapy and transfer to a pain management specialist for headaches. On May 22, 2013, CorVel and Adjuster Hyde mailed a letter of "Non-Certification Recommendation", denying Dr. Hopkins (CorVel's own doctor) medical treatment recommendation. Dr. Hopkins informed Mr. Brayshaw that Adjuster Hyde had accused Mr. Brayshaw of doctor shopping and [f]alse claims of injury because Mr. Brayshaw treated with Dr. Shiu, Mr. Brayshaw's private physician. In reality, Dr. Hopkins completely rejected Hyde's accusations. In reality, Mr. Brayshaw was forced to pay for mounting medical costs and physical therapy while using his personal medical insurance attempting to find relief from his headaches and return to full duty status. Mr. Brayshaw also sustained damage to his right forearm affecting his grip. Mr. Brayshaw worked full duty with this disability due to CorVel's and Hyde's long delays and denials of treatment. For example, during one graveyard shift while handcuffing a DUI suspect, the pain in Mr. Brayshaw's right forearm was so disabling, that Mr. Brayshaw momentarily lost the use of his right hand and dropped the handcuffs.

57.     Shortly after, Mr. Brayshaw was treated by Dr. Lilly on July 23, 2012 at Mr. Brayshaw's own expense. On July 25, 2012, Dr. Hopkins examined Mr. Brayshaw for the continuing forearm injury. Dr. Hopkins agreed the forearm injury was due to the traffic collision of June 2, 2011. Dr. Hopkins also told Mr. Brayshaw that an approval for treatment from CorVel would take 4 to 6 weeks, in which Mr. Brayshaw would have to work light duty.  CorVel's delays in treatment forced Mr. Brayshaw to treat with his personal physician, using his own medical insurance and bear the financial burden for treatment. Mr. Brayshaw was able to return to work on July 30, 2012 as opposed to waiting months for CorVel to approve treatment. On August 21, 2012, CorVel sent Mr. Brayshaw a notice of delayed benefits. CorVel was conducting an [e]mployer level investigation. On October 15, 2012, CorVel and Adjuster Hyde finally accepted the right forearm injury – yet CorVel has refused to reimburse Mr. Brayshaw of any expenses, time lost and medical treatment.

58.     Despite Defendants promises to accept treating physician's opinions on August 21, 2012 CorVel adjuster Mextli Hyde sent denials regarding Mr. Brayshaw's claims for workers' compensation benefits. The denial was sent through the United States Mail denying medical treatment and payments for his on the job injuries.  The denials were a fraudulent communications because CorVel knew that Mr. Brayshaw suffered injuries that occurred on the job.  Moreover, Mr. Brayshaw's injuries were presumed covered under California law. The claims are and were always clearly compensable under California law. Instead, CorVel denied the claim in order to push insurance coverage for Mr. Brayshaw's treatment to his own health insurance, which improperly assisted efforts by Rialto to restructure its debt obligations, receive co-pays from Mr. Brayshaw, direct or limit Mr. Brayshaw's care, and increase bill review fees.  Moreover, Defendants also denied Mr. Brayshaw's claim to discourage him from seeking his statutory benefits by throwing down improper obstacles in the hopes that Mr. Brayshaw would simply give up. In addition, CorVel refused to follow the requests of Mr. Brayshaw's treating physicians, and instead delayed the claim for years to lower its obligations for workers' compensation

payments. Instead of providing Mr. Brayshaw with his owed benefits, Hyde instead accused Mr. Brayshaw of filing false claims.

59.     After an AME report confirmed that Mr. Brayshaw was owed benefits for pneumonia and c-diff, on June 25, 2012 the Commission awarded benefits to Mr. Brayshaw for his injury through an agreed stipulation. Rialto and CorVel failed to fulfill the agreement, including the payment to Mr. Brayshaw for 242 hours of 4850 time (approximately, $10,000.00). The City of Rialto credited Mr. Brayshaw 242 hours of sick time and issued an amended 2008 W-2 in 2013. The IRS promptly denied the amended 2008 Tax Return citing statute of limitations. Mr. Brayshaw has now incurred costs to amend his 2008 tax return. Rialto also assured Mr. Brayshaw it had spoken to the IRS and the amended taxes and W-2 would be accepted. Mr. Brayshaw was provided no assistance when he asked Rialto to correct the 2008 tax problem with the IRS that Rialto and CorVel have created. On December 20, 2012, the Commission awarded benefits to Mr. Brayshaw for his neck injury through agreed stipulation. A petition to re-open was filed by Mr. Brayshaw on September 30, 2013. Yet even after CorVel and Rialto agreement to provide Mr. Brayshaw benefits related to his neck injury, CorVel consistently refused to pay for the necessary treatment, including his chiropractic care that was confirmed in the stipulation.  In addition, CorVel and Rialto consistently failed to pay for Mr. Brayshaw's mileage and expenses related to his workers' compensation claims. Brayshaw's expenses exceed three thousand dollars ($3,000.00).  Mr. Brayshaw was even forced to request a hearing in order to receive his clearly owed reimbursement benefits. Defendants' fraudulent communication with Brayshaw and his providers was accomplished solely through emails, facsimile, the United States Mail, or telecommunication.

60.     Mr. Brayshaw relied on the fraudulent communication because he suffered financial loss including attorney's fees, medical care, and medical mileage.  Defendants' fraud directly caused injury to Mr. Brayshaw because it deprived him of benefits and caused him to pay attorney's fees, medical care (including out-of-pocket deductibles, medical mileage and other costs), suffer emotional pain and damages. Due to the wrongful

denial, delay, and scheme Mr. Brayshaw suffered significant economic damage, humiliation, worry, distress, and continuing economic and physical damage. Moreover, Defendants delay in financial and medical benefits also caused Plaintiff to suffer the loss of wages (including overtime) and future earning capacity, miss promotions, and damaged his pension expectancy. Mr. Brayshaw struggled to sleep at night for months and is being treated for sleep deprivation, experienced unnecessary worry, stress, and concern that impacted his daily activities. Because of the delays in treatment, Mr. Brayshaw works every day with neck pain that causes tension headaches and occasional numbing down his right shoulder and weakness in his right hand. If left unchecked the headaches are severe enough to interfere with Mr. Brayshaw's vision. Mr. Brayshaw at times consumes 6 to 8 "pain-aid" headache tablets a day to combat the headaches caused by the neck injury. The consumption of this amount of pain medication in turn aggravates Mr. Brayshaw's intestinal injury, also causing Mr. Brayshaw to work with low level nausea, diarrhea and a high possibility of future stomach complications, all because CorVel and Hyde denied the necessary medical treatment for Mr. Brayshaw's on-duty injuries. Additionally, Mr. Brayshaw has suffered financial harm and damage to his credit along with IRS issues from 2008.

### **What Defendants did to Police Officer Joseph Viola**

61. Joseph Viola worked as a police officer for the City of Rialto for over 12 years. While on patrol protecting the city of Rialto, Mr. Viola suffered a series of injuries to his lower back while acting in the scope of his employment beginning in the early 2000s. Because Mr. Viola was a peace officer, this injury was presumed to be covered. Mr. Viola's treating physician, Dr. Mark Greenspan, further confirmed that he suffered the injury. On April 25, 2011, Mr. Viola filed a claim for workers' compensation benefits. Viola provided testimony, medical records, medical opinions, and other evidence to Defendants and Rialto establishing his right to worker's compensation benefits. Thus Rialto was required to promptly provide Viola benefits.

62. Despite Defendants promises to accept treating physician's opinions in

2011, CorVel adjuster Mextli Hyde sent denials regarding Viola's claims for workers' compensation benefits. The denial was sent through the United States Mail denying medical treatment and payments for his on-the-job injuries. The denials were a fraudulent communications because CorVel knew that Mr. Viola suffered injuries to his back. Moreover, Mr. Viola's injuries were presumed covered under California law. The claims are and were always clearly compensable under California law. Instead, CorVel denied the claim in order to push insurance coverage for Mr. Viola's treatment to his own health insurance, which improperly assisted efforts by Rialto to restructure its debt obligations, receive co-pays from Mr. Viola, direct or limit Mr. Viola's care, and increase bill review fees. Moreover, Defendants also denied Mr. Viola's claim to discourage him from seeking his statutory benefits by throwing down improper obstacles. In addition, CorVel refused to follow the requests of Mr. Viola's treating physicians, and instead delayed the claim for years to lower its obligations for workers' compensation payments.

63. Subsequent to the denial, CorVel, Rialto, and its agents attempted to coerce Mr. Viola to sign a settlement agreement stipulating to a 0% impairment rating. Finally after sending Mr. Viola through an Agreed Medical Exam that further confirmed his disability, on September 17, 2013 Defendants agreed to stipulate to a 20% impairment rating for Viola. Unfortunately, Defendants delay in payment of benefits and medical care caused separate and distinct physical and financial damage to Viola. Defendants' fraudulent communication with Viola and his providers was accomplished through emails, facsimile, the United States Mail, or telecommunication.

64. Mr. Viola relied on the fraudulent communication because he suffered financial loss including attorney's fees, medical care, and medical mileage. Defendants' fraud directly caused injury to Plaintiff because it deprived him of benefits and caused him to pay attorney's fees, medical care (including out-of-pocket deductibles, medical mileage and other costs), suffer emotional pain and damages. Due to the wrongful denial, delay, and scheme Plaintiff suffered significant economic damage, humiliation, worry, distress, and continuing economic and physical damage. Moreover, Defendants delay in

financial and medical benefits also caused Plaintiff to suffer the loss of wages (including overtime) and future earning capacity, miss promotions, and damaged his pension expectancy. Additionally, Mr. Viola has suffered financial harm and damage to his credit.

### What Defendants Did to Firefighter Jacob Huber

65.     Mr. Huber worked as a firefighter for the City of Rialto for over 8 years. While lifting a patient on October 7, 2009, Mr. Huber injured his right shoulder.  Mr. Huber immediately sought medical treatment, and his treating physician confirmed that he tore his rotator cuff.

66.     Despite Defendants promises to accept treating physician's opinions in 2010, CorVel and York adjuster Mextli Hyde sent denials regarding Huber's claims for workers' compensation benefits. The denial was sent through the United States Mail denying medical treatment and payments for his on the job injuries.  The denials were a fraudulent communications because CorVel knew that Huber suffered injuries to his back. The claims are and were always clearly compensable under California law. Instead, CorVel denied the claim in order to push insurance coverage for Huber's treatment to his own health insurance, which improperly assisted efforts by Rialto to restructure its debt obligations, receive co-pays from Huber, direct or limit Huber's care, and increase bill review fees.  Moreover, Defendants also denied Huber's claim to discourage him from seeking his statutory benefits by throwing down improper obstacles. Instead, Hyde, CorVel and York attempted to convince Huber into receiving cheaper conservative treatment despite his doctors' confirmation that the surgery was required. In addition, CorVel refused to follow the requests of Huber's treating physicians, and instead delayed the claim to lower its obligations for workers' compensation payments.

67.     Subsequent to the denial, Defendants finally accepted Mr. Huber's claim and granted him surgery.  In addition on February 10, 2011, Defendants agreed to stipulate to payments for Huber's disability.  Unfortunately, Defendants delay in payment of benefits and needed surgery caused separate and distinct physical and financial damage to Huber. Defendants' fraudulent communication with Huber and his providers was

accomplished solely through emails, facsimile, the United States Mail, or telecommunication.

68. Mr. Huber relied on the fraudulent communication because he suffered financial loss including attorney's fees, medical care, and medical mileage Defendants' fraud directly caused injury to Plaintiff because it deprived him of benefits and caused him to pay attorney's fees, medical care (including out-of-pocket deductibles, medical mileage and other costs), suffer emotional pain and damages. Due to the wrongful denial, delay, and scheme Plaintiff suffered significant economic damage, humiliation, worry, distress, and continuing economic and physical damage. Moreover, Defendants delay in financial and medical benefits also caused Plaintiff to suffer the loss of wages (including overtime) and future earning capacity, miss promotions, and damaged his pension expectancy. Additionally, Mr. Huber has suffered financial harm and damage to his credit.

## What Defendants Did to Police Officer Carla McCullough

69. Carla McCullough worked as a Police Officer for the Police Department for the City of Rialto. While on patrol on, Ms. McCullough was in a severe car accident on October 13, 1998. Initially, Defendants stipulated to cover Ms. McCullough's claim on August 30, 2004. Unfortunately over the next 15 years, CorVel, York, and Rialto consistently denied and delayed coverage for Ms. McCullough's treatment, including chiropractic care that it had previously agreed to provide. Thus Ms. McCullough was forced to file multiple claims for workers' compensation benefits to receive her required benefits.

70. Despite Defendants promises to accept treating physician's opinions and promises to cover Ms. McCullough's claim, CorVel adjuster Mextli Hyde sent a denial regarding Ms. McCullough's claims for workers' compensation benefits multiple times in 2010 through 2013. The denials were sent through the United States Mail denying medical treatment and payments for her on the job injuries. The denials were a fraudulent communications because CorVel knew that Ms. McCullough suffered injuries to her back. Moreover, Ms. McCullough's injuries were presumed covered under California law. The

claims are and were always clearly compensable under California law. Instead, CorVel denied the claim in order to push insurance coverage for Ms. McCullough's treatment to her own healthcare through Rialto, which improperly assisted efforts by Rialto to restructure its debt obligations, receive co-pays from Ms. McCullough, direct or limit Ms. McCullough's care, and increase bill review fees.  Moreover, Defendants also denied Ms. McCullough's claim to discourage her from seeking his statutory benefits by throwing down improper obstacles.  In addition, CorVel refused to follow the requests of Ms. McCullough's treating physicians, and instead delayed the claim for years to lower its obligations for workers' compensation payments.

71.    Indeed, rather than provide the continued on-going care and benefits, Mextli Hyde told Ms. McCullough she needed to simply take muscle relaxers and ibuprofen. Hyde, CorVel and York continued to delay Ms. McCullough's required treatment in order to lower its costs, in the hopes that Ms. McCullough would give up on her statutory benefits.  In essence, Hyde, York, and CorVel forced Ms. McCullough to file two more claims for worker's compensation benefits. Finally, on August 20, 2011 Defendants filed a stipulation agreeing to continue care for Ms. McCullough, including chiropractic treatment.  Then again on July 1, 2013, CorVel and Rialto stipulated to continued care for Ms. McCullough.  Unfortunately, Defendants delay in payment of benefits and needed medical care caused separate and distinct physical and financial damage to McCullough. Defendants' fraudulent communication with McCullough and her medical providers was accomplished solely through emails, facsimile, the United States Mail, or telecommunication.

72.    Ms. McCullough relied on the fraudulent communication because she suffered financial loss including attorney's fees, medical care, and medical mileage. Defendants' fraud directly caused injury to Plaintiff because it deprived her of benefits and caused her to pay attorney's fees, medical care (including out-of-pocket deductibles, medical mileage and other costs), suffer emotional pain and damages. Due to the wrongful denial, delay, and scheme Plaintiff suffered significant economic damage, humiliation,

worry, distress, and continuing economic and physical damage.  Moreover, Defendants delay in financial and medical benefits also caused Plaintiff to suffer the loss of wages (including overtime) and future earning capacity, miss promotions, and damaged her pension expectancy. Ms. McCullough struggled to sleep at night for months and experienced unnecessary worry, stress, and concern that impacted her daily activities. Additionally, Ms. McCullough has suffered financial harm and damage to her credit.

### **What Defendants Did to Police Officer John Black**

73.     John Black worked as a Police Officer for the Police Department for the City of Rialto for over 13 years.  While working on-the-job December 29, 2008, Mr. Black suffered an injury to his back. Initially the city accepted Mr. Black's claim but continued to deny his required care and benefits owed from the injury, including treatment required by Mr. Black's treating physicians, Dr. Paul Wakim and Dr. Robert Ahearn.

74.     Despite Defendants promises to accept treating physician's opinions 2011 through 2012, CorVel and York adjuster Mextli Hyde sent denials regarding Mr. Black's claims for workers' compensation benefits. The denials were sent through the United States Mail denying medical treatment and payments for his on the job injuries.  The denials were fraudulent communications because Defendants knew that Mr. Black suffered injuries to his back.  The claims are and were always clearly compensable under California law. Instead, CorVel denied the claim in order to push insurance coverage for Mr. Black's treatment to his own health insurance, which improperly assisted efforts by Rialto to restructure its debt obligations, receive co-pays from Mr. Black, direct or limit Mr. Black's care, and increase bill review fees.  Moreover, Defendants also denied Mr. Black's claim to discourage him from seeking his statutory benefits by throwing down improper obstacles.  In addition, CorVel refused to follow the requests of Mr. Black's treating physicians including Dr. Paul Wakim. Dr. Decky, and Dr. Robert Ahearn, and instead delayed the claim for years to lower its obligations for workers' compensation payments.

75.     Finally on May 14, 2012, CorVel and Rialto agreed to stipulate to coverage

for Mr. Black's injury, including treatment and payment for disability benefits.  But even after the stipulation, Defendants consistently refused to pay for medical benefits owed to Mr. Black, forcing him to pay either out of pocket or through his own health insurance. Unfortunately, Defendants delay in payment of benefits caused separate and distinct physical and financial damage to Mr. Black. Defendants' fraudulent communication with Mr. Black and his providers was accomplished solely through emails, facsimile, the United States Mail, or telecommunication.

76.    Mr. Black relied on the fraudulent communication because he suffered financial loss including attorney's fees, medical care, and medical mileage.  Defendants' fraud directly caused injury to Plaintiff because it deprived him of benefits and caused him to pay attorney's fees, medical care (including out-of-pocket deductibles, medical mileage and other costs), suffer emotional pain and damages. Due to the wrongful denial, delay, and scheme Plaintiff suffered significant economic damage, humiliation, worry, distress, and continuing economic and physical damage. Moreover, Defendants delay in financial and medical benefits also caused Plaintiff to suffer the loss of wages (including overtime) and future earning capacity, miss promotions, and damaged his pension expectancy. Mr. Black struggled to sleep at night for months and experienced unnecessary worry, stress, and concern that impacted his daily activities.  Additionally, Mr. Black has suffered financial harm.

### What Defendants Did to Rialto Firefighter Justin Veloz

77.    Justin Veloz worked in the fire department for the City of Rialto for over 8 years. While protecting the city of Rialto, Mr. Veloz suffered a series of injuries to his while acting in the scope of his employment.  First in 2009, Mr. Veloz suffered a hernia injury while lifting a patient.  Not too long thereafter, on September 27, 2010, Mr. Veloz injured his shoulder while fighting a fire. Mr. Veloz sought treatment for both of his injuries and reported the injuries to his employer. Dr. Kim, Mr. Veloz's treating physician, confirmed that surgery was necessary both for a hernia and his shoulder injury.

78.    Despite Defendants promises to accept treating physician's opinions in

2011, CorVel adjuster Mextli Hyde sent denials regarding Mr. Veloz's claims for workers' compensation benefits. The denials were sent through the United States Mail denying medical treatment and payments for his on the job injuries.  The denials were a fraudulent communications because CorVel knew Mr. Veloz suffered the injury. Moreover, Mr. Veloz's injuries were presumed covered under California law. The claims are and were always clearly compensable under California law. Instead, CorVel denied the claim in order to push insurance coverage for Mr. Veloz's treatment to his own health insurance, which improperly assisted efforts by Rialto to restructure its debt obligations, receive co-pays from Mr. Veloz, direct or limit Mr. Veloz's care, and increase bill review fees.  Moreover, Defendants also denied Mr. Veloz's claim to discourage him from seeking his statutory benefits by throwing down improper obstacles.  In addition, CorVel refused to follow the requests of Mr. Veloz's treating physicians, and instead delayed the claim for years to lower its obligations for workers' compensation payments.

79.    In addition, Defendants consistently refused to reimburse Mr. Veloz for his owed mileage and relates expenses.  Finally on June 11, 2014, CorVel and Rialto agreed to stipulate to coverage for Mr. Veloz' injury, including his surgery and payment for permanent disability benefits. Unfortunately, Defendants delay in payment of benefits and needed surgery caused separate and distinct physical and financial damage to Mr. Veloz. Defendants' fraudulent communication with Mr. Veloz and his providers was accomplished solely through emails, facsimile, the United States Mail, or telecommunication.

80.    Mr. Veloz relied on the fraudulent communication because he suffered financial loss including attorney's fees, medical care, and medical mileage.  Defendants' fraud directly caused injury to Plaintiff because it deprived him of benefits and caused him to pay attorney's fees, medical care (including out-of-pocket deductibles, medical mileage and other costs), suffer emotional pain and damages. Due to the wrongful denial, delay, and scheme Plaintiff suffered significant economic damage, humiliation, worry, distress, and continuing economic and physical damage. Moreover, Defendants delay in

financial and medical benefits also caused Plaintiff to suffer the loss of wages (including overtime) and future earning capacity, miss promotions, and damaged his pension expectancy. Additionally, Mr. Veloz has suffered financial harm and damage to his credit.

**What Defendants Did to Rialto Firefighter Thomas Stephenson**

81.     Thomas Stephenson worked as a Firefighter for the Fire Department for 11 years for the City of Rialto.  While working on duty in July 2012, Mr. Stephenson injured his shoulder while climbing down a water tower. Mr. Stephenson reported the injury, and sought treatment for his shoulder from Dr. Ronny Ghazal.  Dr. Ghazal confirmed that Mr. Stephenson suffered a torn labrum.

82.     Despite Defendants promises to accept treating physician's opinions, CorVel adjuster Mextli Hyde refused to authorize Mr. Stephenson's required surgery. The denial was sent through the United States Mail denying medical treatment and payments for his on the job injuries.  The denials were a fraudulent communications because CorVel knew that Mr. Stephenson suffered injuries to his back.  The claims are and were always clearly compensable under California law. Instead, Defendants denied the claim in order to push insurance coverage for Mr. Stephenson's treatment to his own health insurance, which improperly assisted efforts by Rialto to restructure its debt obligations, receive co-pays from Mr. Stephenson, direct or limit Mr. Stephenson's care, and increase bill review fees.  Moreover, Defendants also denied Mr. Stephenson's claim to discourage him from seeking his statutory benefits by throwing down improper obstacles.  In addition, CorVel refused to follow the requests of Mr. Stephenson's treating physicians, and instead delayed the claim to lower its obligations for workers' compensation payments.

83.     Finally, after months of delays, Mr. Stephenson finally received his needed surgery on December 10, 2012. Unfortunately, Defendants delay in payment of benefits and needed surgery caused separate and distinct physical and financial damage to Mr. Stephenson. Defendants' fraudulent communication with Stephenson and his providers was accomplished solely through emails, facsimile, the United States Mail, or telecommunication.

84.     Mr. Stephenson relied on the fraudulent communication because he suffered financial loss including attorney's fees, medical care, and medical mileage. Defendants' fraud directly caused injury to Plaintiff because it deprived him of benefits and caused him to pay attorney's fees, medical care (including out-of-pocket deductibles, medical mileage and other costs), suffer emotional pain and damages. Due to the wrongful denial, delay, and scheme Plaintiff suffered significant economic damage, humiliation, worry, distress, and continuing economic and physical damage. Moreover, Defendants delay in financial and medical benefits also caused Plaintiff to suffer the loss of wages (including overtime) and future earning capacity, miss promotions, and damaged his pension expectancy. Additionally, Mr. Stephenson has suffered financial harm and damage to his credit.

## What Defendants Did to Fire Captain Geoffrey Barrett

85.     Geoffrey Barrett worked as a Fire Captain for the Fire Department for the City of Rialto.  Mr. Barrett suffered a knee and hamstring injury on August 22, 2013. This injury was always clearly compensable under California law and occurred within the scope of his employment with Rialto.  As a result of that injury, Mr. Barrett was subsequently diagnosed with a torn meniscus.

86.     Despite Defendants promises to accept treating physician's opinions CorVel adjuster Mextli Hyde refused to authorize Mr. Barrett's claims for workers' compensation benefits. The denial was sent through the United States Mail denying medical treatment and payments for his on the job injuries.  The denials were a fraudulent communications because CorVel knew Mr. Barrett suffered injuries to his leg and knee.  The claims are and were always clearly compensable under California law. Instead, CorVel denied the claim in order to push insurance coverage for Mr. Barrett's treatment to his own health insurance, which improperly assisted efforts by Rialto to restructure its debt obligations, receive co-pays from Mr. Barrett, direct or limit Mr. Barrett's care, and increase bill review fees.  Moreover, Defendants also denied Mr. Barrett's claim to discourage him from seeking his statutory benefits by throwing down improper obstacles.  In addition,

CorVel refused to follow the requests of Mr. Barrett's treating physicians, and instead delayed the claim for years to lower its obligations for workers' compensation payments.

87. Finally, after months of delays, Mr. Barrett finally received his needed surgery in July 2014. Unfortunately, Defendants delay in payment of benefits and needed surgery caused separate and distinct physical and financial damage to Mr. Barrett. Defendants' fraudulent communication with Mr. Barrett and his providers was accomplished solely through emails, facsimile, the United States Mail, or telecommunication.

88. Mr. Barrett relied on the fraudulent communication because he suffered financial loss including medical care and medical mileage Defendants' fraud directly caused injury to Plaintiff because it deprived him of benefits and caused him to pay attorney's fees, medical care (including out-of-pocket deductibles, medical mileage and other costs), suffer emotional pain and damages. Due to the wrongful denial, delay, and scheme Plaintiff suffered significant economic damage, humiliation, worry, distress, and continuing economic and physical damage. Moreover, Defendants delay in financial and medical benefits also caused Plaintiff to suffer the loss of wages (including overtime) and future earning capacity, miss promotions, and damaged his pension expectancy.Mr. Barrett struggled to sleep at night for months and experienced unnecessary worry, stress, and concern that impacted his daily activities. Additionally, Mr. Barrett has suffered financial harm and damage to his credit.

### What Defendants did to Fire Captain Brian Park

89. Brian Park worked as a Fire Captain for the Fire Department for the City of Rialto. On April 18, 2010, while fighting a fire on a hillside, a large boulder fell and pinned Mr. Park's leg. Unfortunately, the weight of the boulder caused Mr. Park to suffer a spiral fracture of his tibia and fibula. Initially CorVel, York, and Rialto accepted Mr. Park's claim and authorized a surgery for his leg with Dr. Ghazal. Because Mr. Park continued to suffer severe pain he sought additional treatment and remained off-work at the advice of his doctor. During an appointment with Dr. Merkel and Dr. Ghazal in

January, York and Rialto pushed the doctors to release Mr. Park back to work before completing treatment.  But the doctors maintained Mr. Park's off-duty status.  After the nurse case manager submitted the off-duty work status, York and the city instructed the doctor to change Mr. Park's off-work status.  The City and York then refused to issue payment for Mr. Park's workers' compensation benefits and forced him to take sick-time in order to cover his off-duty status.

90.    Despite Defendants' promises to accept treating physician's opinions, CorVel adjuster Mextli Hyde sent a denial regarding Mr. Park's claims for workers' compensation benefits. The denial was sent through the United States Mail denying medical treatment and payments for his on the job injuries.  The denials were a fraudulent communications because CorVel knew that Mr. Park suffered injuries. .  The claims are and were always clearly compensable under California law. Instead, CorVel denied the claim in order to push insurance coverage for Mr. Park's treatment to his own health insurance, which improperly assisted efforts by Rialto to restructure its debt obligations, receive co-pays from Mr. Park, direct or limit Mr. Park's 's care, and increase bill review fees.  Moreover, Defendants also denied Mr. Park's claim to discourage him from seeking his statutory benefits by throwing down improper obstacles.  In addition, CorVel refused to follow the requests of Mr. Park's treating physicians, and instead delayed the claim for years to lower its obligations for workers' compensation payments.

91.    Mr. Park then sought treatment from Dr. Kamran Jamshidinia for his leg and foot. York agreed initially to authorize the appointment from Dr. Jamshidinia, but before the appointment, York completely cut  off all care.  Rialto and York, then told Mr. Park that his care was denied because the treatment involved a 9 month recovery – meaning the treatment would cost the city Mr. Park's services for too long.  Because he was left with no choice regarding his work-status, Mr. Park began to work light duty in severe pain on April 4, 2011.

92.    In all, Mr. Park was fraudulently denied indemnity benefits, treatment including surgery, and reimbursement for mileage and co-pays that were owed from the

treatment. Defendants denied these benefits in order to force Mr. Park to start working for the city sooner than his doctor's recommended and in order to limit the exposure to its workers' compensation liability.

93.    Finally in 2011, Defendants agreed to reimburse Mr. Park his owed time. But Defendants continued to delay treatment for his surgery. In addition, with information and belief, CorVel finally approved Mr. Park's surgery in the fall of 2014.  Unfortunately, Defendants delay in payment of benefits and medical care caused separate and distinct physical and financial damage to Mr. Park. Defendants' fraudulent communication with Mr. Park and his providers was accomplished solely through emails, facsimile, the United States Mail, or telecommunication.

94.    Mr. Park relied on the fraudulent communication because he suffered financial loss including attorney's fees, medical care, and medical mileage.  Defendants' fraud directly caused injury to Plaintiff because it deprived him of benefits and caused him to pay attorney's fees, medical care (including out-of-pocket deductibles, medical mileage and other costs), suffer emotional pain and damages. Due to the wrongful denial, delay, and scheme Plaintiff suffered significant economic damage, humiliation, worry, distress, and continuing economic and physical damage. Moreover, Defendants delay in financial and medical benefits also caused Plaintiff to suffer the loss of wages (including overtime) and future earning capacity, miss promotions, and damaged his pension expectancy. Mr. Park struggled to sleep at night for months and experienced unnecessary worry, stress, and concern that impacted his daily activities.  Additionally, Mr. Park has suffered financial harm and damage to his credit.

## V.    PARTIES

95.    Plaintiffs Russell Thurman, Boyd Mayo, Vernell Ross-Mullin, John Black, Victor Gregory, Thomas Stephenson, Jacob Huber, Carla McCullough, Tim Brayshaw, Dustin Fujiwara, Joseph Viola, Justin Veloz, Geoffrey Barrett and Brian Park reside in California or Oregon.  All plaintiffs are or were employees of the City of Rialto and the City of Stockton and work or worked in either the Fire Department or Police Department.

96.     Defendant CorVel Enterprise Comp, Inc., ("CorVel") is a Delaware entity with a principal place of business in California, which  adjusts insurance claims made by California employees on behalf of The City of Stockton ("Stockton") and City of Rialto ("Rialto") for coverage under California Labor Code Section 110-139.6, the California Workers' Compensation Act.  CorVel Enterprise conducts business in San Bernardino and Riverside County, California.

a.     Service of process may be effected on CorVel Enterprise by certified mail, return receipt requested, to its registered agent,  **CORPORATION SERVICE COMPANY, 2710 GATEWAY OAKS DR STE 150N, SACRAMENTO, CALIFORNIA 95833.**

b.     All acts complained of CorVel Enterprise herein were committed by CorVel Enterprise directly, or under its supervision and direction.

c.     All acts complained of CorVel Enterprise herein that were committed by and through its authorized servants, employees, and agents, were committed while acting within the scope of their employment, service agreement, and agency, in concert with Defendant CorVel Enterprise.

d.     All acts complained of CorVel Enterprise herein that were committed through any of its servants, employees, or agents, were also ratified by CorVel Enterprise.

e.     CorVel Enterprise is vicariously liable for all acts complained of herein that were committed by or through any authorized servants, employees, or agents of CorVel Enterprise.

97.     Defendant YORK RISK SERVICES GROUP, INC. ("York") formerly operating as Gregory B. Bragg & Associates, Inc. is a foreign corporation who previously adjusted insurance claims made by California employees on behalf of The City of Stockton ("Stockton") and City of Rialto ("Rialto") for coverage under California Labor Code Section 110-139.6, the California Workers' Compensation Act.

98.      York conducts business in San Bernardino and Riverside County, California.

a.     Service of process may be effected on York by certified mail, return receipt

requested, to its registered agent, **CORPORATION SERVICE COMPANY, 2710 GATEWAY OAKS DR STE 150N, SACRAMENTO CA 95833**

b.      All acts complained of York herein were committed by York directly, or under its supervision and direction.

c.      All acts complained of York herein that were committed by and through its authorized servants, employees, and agents, were committed while acting within the scope of their employment, service agreement, and agency, in concert with Defendant York.

d.      All acts complained of York herein that were committed through any of its servants, employees, or agents, were also ratified by York.

e.      York is vicariously liable for all acts complained of herein that were committed by or through any authorized servants, employees, or agents of York.

99.    At all times and in all actions plead in this complaint; York and CorVel were acting as agent for, or in concert with certain Rialto and Stockton administrators. York and CorVel were the third party administrators (TPA) for Stockton and Rialto and required to adjust and administer workers' compensation claims and were supposed to exercise independent and unbiased investigation and handling of injury claims.

100.   Defendant Mextli Hyde ("Ms. Hyde") upon information and belief, is a natural person, working and residing in Los Angeles County, California.  Ms. Hyde may be served by service upon her to **Mextli Hyde 760 RANCHO EL FUERTE DR COVINA, CA 91724-3653.**

101.   Defendant Paula Fantulin upon information and belief, is a natural person, working and residing in San Joaquin County, California.  Fantulin may be served by service upon her to **Paula Fantulin, 2837 Christina Ave Stockton, CA 95204-1415.**

102.   Defendant Brittany M. Faith upon information and belief, is a natural person, working and residing in San Joaquin County, California.  Faith may be served by service upon her to **Brittany M. Faith 724 E Mayfair Ave Stockton, CA 95207-4838.**

103.    Defendant Tanya Mullins upon information and belief, is a natural person, working and residing in San Joaquin County, California.  Mullins may be served by service upon her to **Tanya Mullins, 682 Valentine Ct Galt, CA 95632-3312.**

## VI.    VENUE & JURISDICTION

104.    Federal question jurisdiction is conferred by Plaintiffs' claims under the Federal Racketeer Influence and Corrupt Organizations Act, 18 USC §1961 et seq (RICO) and 42 U.S.C. §§1983, 1988. The Court has jurisdiction over Plaintiffs' additional claims based on 28 USC §1367(a).

105.    Venue is properly laid in the Federal District Court for the District of California, Eastern Division, because plaintiffs reside in that district and defendants do business in person and through their agents and representatives in San Bernardino and Riverside County. Moreover the CorVel entities and Hyde are residents of the Central District of California.

## VII.    ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

106.    This case is based upon a long term and ongoing scheme to delay and deny California workers' compensation benefits to plaintiffs when CorVel, York, Rialto, and Stockton knew that they did not have a sound basis under the law and facts of each case for doing so.

107.    The activities affected interstate commerce in several ways including that:

    a.  CorVel and York operate in interstate commerce;

    b.  The mails, telephones, fax and internet communications are all utilized in the course of the activities complained of;

    c.  Denial of benefits caused economic effects on medical service providers and other medical insurance companies many of whom operate in interstate commerce;

    d.  CorVel processed Plaintiffs' claims through a data center located in Portland, Oregon.

108.    The cities of Stockton and Rialto employed each of the plaintiffs.

109.   The cities of Stockton and Rialto complied with its obligations under California law to provide firefighters and police officers workers' disability compensation insurance by self-insuring.

110.   CorVel and York are TPAs (third party administrators) that adjusted workers' compensation claims made by Rialto and Stockton First Responders.

111.   Mextli Hyde is an adjuster that worked for York and CorVel, and she adjusted claims for the city of Rialto.

112.   CorVel, and York acted as agents for Rialto and Stockton with regard to the handling of workers' compensation claims.

113.   Decisions regarding paying claims or terminating payment were made jointly by CorVel, York, Rialto, and Stockton, or were made by CorVel or York after consulting with Rialto and Stockton or were ratified by Rialto and Stockton after being made by CorVel or York.

114.   In every instance complained of herein CorVel, York, Rialto and Stockton, as part of an ongoing enterprise and scheme more particularly described in the remaining paragraphs fraudulently refused to pay workers' compensation benefits to workers.  They denied benefits without reasonable investigation and without forming a good faith belief that the standards for compensable disability had not been met when evidence of entitlement to benefits had been provided by the workers.  Instead defendants:

> a.   acted with knowledge that the methods they were using to investigate claims, to have workers examined by physicians of their choice, to decide whether a disability was compensable and to report the results of the investigation to workers, employers, the Department of Workers Compensation, medical providers and others ignored evidence of compensability and produced false evidence that the workers were not entitled to compensation.

> b.   Defendants also ignored information that the methods they used to investigate claims, have workers examined pursuant to statute, and to decide compensability did not accurately reflect the standards for compensability under the

Workers' Compensation Act.

115.   With information and belief, CorVel, York, Stockton, and Rialto misrepresented the coverage of Plaintiffs' claims based on the following:

    a.   CorVel, York, Stockton, and Rialto denied claims in order to push the benefits to each Plaintiff's private insurance, which allowed Defendants to restructure its debt obligations, receive co-pays from the Plaintiffs, negotiate with medical providers, direct or limit care, and increase bill review fees.

    b.   CorVel, York, Stockton, and Rialto systematically denied claims to create a lulling effect to limit the benefits and treatment sought by injured workers. For example, Defendants denied the claims in hopes that some Plaintiffs will simply not continue to seek benefits under workers' compensation entirely. Indeed, Defendants knew that if a Plaintiff received medical coverage on his own insurance the injured worker would be less likely to continue his claim for workers' compensation if had been denied.  In addition, the fraud limited the care sought by Plaintiffs who filed workers' compensation claims benefits during the denial period.

    c.   CorVel, York, Stockton, and Rialto delayed claims by ignoring California law regarding coverage for pre-existing injuries aggravated by a new incident and ignoring injuries presumed covered under California law. *See e.g.* Labor Code Section § 3212.1 (Cancer); § 3212 (Hernia, heart injuries, and pneumonia); and § 3213.2 (lower back).

    d.   CorVel, York, Stockton, and Rialto ignored treating physicians entirely and instead delayed and denied claims until the injured workers attended either an Agreed Medical Examination ("AME") or a Qualified Medical Examination ("QME").

116.   The actions of York and CorVel as described generally above and with greater particularity below violated RICO, 18 U.S.C. 1962 (c) and (d) in the following ways:

    a.   York and CorVel fraudulently denied benefits to workers who York and

CorVel knew were entitled to workers' compensation benefits under existing law, in ways more particularly described in the remaining paragraphs of this complaint;

b. This fraud was accomplished in part by use of the United States mail and by electronic communications in violation of 18 USC 1341 and 1343.

c. This fraud also violated 18 U.S.C. § 1344 because Defendants' scheme to defraud enabled Defendants to obtain and retain funds under the custody or control of a financial institution.

d. Some of these electronic and mail communications contained fraudulent misrepresentations, in that they communicated alleged facts and opinions about the medical condition of the workers and/or about the causes of those conditions and their relationship to employment that York knew were false or as to which the York knew there was no genuine basis for the opinions expressed.

e. Some of the electronic and mail communications were not in themselves false or fraudulent but were employed in the scheme to defraud, such as letters and notices scheduling appointments with physicians for so-called "independent medical examinations," when the defendants, their agents and attorneys knew from ample past experience that the examinations would not be conducted properly and/or in good faith but would instead be designed to form a basis for denying benefits irrespective of the worker's medical condition and its compensability;

f. York and CorVel knew certain of the doctor examiners were not "independent" because they knew the doctors were financially dependent to a significant degree on companies defending insurance claims (including employers, insurers and TPAs);

g. York and CorVel, and their agents and attorneys, deliberately selected certain doctors to obtain a medical opinion which defendants either

directed to be negative as to critical elements of a workers' compensation claim relating to disability or relationship to employment or knew from ample experience with such doctors would state negative opinions on these elements irrespective of the true facts.  These allegations are based in part on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

  h. Rialto, Stockton, York and CorVel systematically as part of their scheme to defraud denied benefits by failing to honestly assess evidence that a claimant had a work related disability, and or by failing to honestly investigate and obtain evidence relevant to whether a claimant had a work related disability.

117. In each of the cases in which they terminated or denied benefits, York and CorVel by themselves and through and their agents and attorneys, acted fraudulently, in a scheme to defraud which used the mails and wires in violation of 18 U.S.C. 1961, et seq, by:

  a. failing to investigate honestly whether a claimant was entitled to benefits under California law before they denied or terminated benefits;

  b. denying claims in order to push the benefits to each Plaintiff's private insurance, which allowed Defendants to restructure its debt obligations, receive co-pays from the Plaintiffs, direct or limit care, and increase bill review fees;

  c. denying claims by ignoring California law regarding coverage for pre-existing injuries aggravated by a new incident and ignoring injuries presumed covered under California law. *See e.g.* Labor Code Section § 3212.1 (Cancer); § 3212 (Hernia, heart injuries, and pneumonia); and § 3213.2 (lower back);

  d. deliberately seeking opinions from doctors York knew would deny compensability or otherwise support a decision to pay less than what was actually owed;

e. deliberately failing to obtain and to give honest consideration to reports and records of a claimant's treating doctors, and any other relevant information; and

f. denying claims to create a lulling effect to limit the benefits and treatment sought by injured workers. For example, Defendants denied the claims in hopes that some Plaintiffs will simply not continue to seek benefits under workers' compensation entirely. Indeed, Defendants knew that if a Plaintiff received medical coverage on his own insurance the injured worker would be less likely to continue his claim for workers' compensation if had been denied.  In addition, the fraud limited the care sought by Plaintiffs who filed workers' compensation claims benefits during the denial period.

118.   CorVel and York's intentional failures to investigate honestly whether a claimant's disability was work-related under any of the relevant provisions of California law, and their deliberate failure to give honest consideration to the records and reports of a claimant's treating doctors and any other relevant medical records or information, and to honestly weigh those records and reports against the report of a doctor chosen by defendants to examine a claimant was mail and wire fraud in violation of 18 U.S.C. 1341 and 1343 because the mails and wires were used in furtherance of the scheme to defraud.  In addition, York's misrepresentations in order to push the cost of care to Plaintiffs' out-of-pocket expense violated 18 U.S.C. 1344.

119.   The predicate acts and violations of RICO alleged herein were committed by one or more of the following enterprises:

a. The workers' compensation personnel at the workers' compensation claims departments at York and CorVel who handled California workers' compensation claims and personnel at the City of Rialto and the City of Stockton associated in fact formed an "enterprise" for purposes of the Racketeer Influenced and Corrupt Organizations Act (RICO) claims in this

case.  Because they worked together regularly in adjusting and handling workers' compensation claims for California workers, they formed an enterprise.

   b.  Additionally or alternatively, the following persons or entities are an "enterprise" which acted to defraud Plaintiffs of their workers' compensation benefits:

     i.  the workers' compensation claims personnel at York and CorVel who handled California claims and the personnel at the Cities of Rialto and Stockton;

     iii. the workers' compensation claims personnel at York and CorVel plus the doctors employed by York to examine the plaintiffs, associating in fact in the handling of workers' compensation claims.

     iii. the workers' compensation claims personnel at York who handled California claims and the personnel at CorVel; and

     iv. the workers' compensation claims personnel at York and CorVel.

   120.  Each enterprise was an organization which existed not only for the purpose of defrauding Plaintiffs of their workers' compensation benefits; the enterprise engaged in other activities, such as the administration of workers' compensation claims and the examination of individuals claiming workers' compensation and other benefits.  Each enterprise has existed for many years, and in each enterprise different persons had different roles concerning the conduct of the enterprise, not limited to the commission of the fraudulent acts complained of herein.

   121.  Two or more enterprises may have acted together to defraud one or more Plaintiffs of their workers' compensation benefits.

   122.  By means of the actions described in the complaint, York and CorVel conspired to violate 18 U.S.C. 1962, and conspired with one or more other parties or the employees of the City of Rialto and City of Stockton to violate 18 U.S.C. 1962.  York, CorVel, Rialto, and Stockton through the actions of their employees involved in the handling

of California workers' compensation claims, and physicians chosen by York, CorVel, Rialto, and Stockton to examine claimants, agreed to participate in the commission of the predicate acts which are alleged in this complaint.  Such actions of conspiracy proximately caused or contributed to Plaintiffs' damages, as a result of which defendants are liable to Plaintiffs under section 1962(d).  The allegations in this paragraph are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

123.    With regard to the claims of the individual plaintiffs and all other victims of the scheme, Defendant used the mail and wires for interstate communications in effectuation of their scheme, demonstrating and involving a threat of continuing racketeering activity against employees of Rialto and Stockton who are entitled to California workers' compensation benefits.  Defendant's actions violated 18 U.S.C. 1341, 1343, and 1344. The claims of each plaintiff arise under 18 U.S.C. §§1961, 1962, 1964 and 1965.  The allegations made in the following individual claims are based on the facts alleged herein, and in part on information and belief and are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

124.    Each and every one of the forgoing common allegations is intended to apply to all the counts of this complaint as though fully restated in each.

## VIII.  FIRST CAUSE OF ACTION AGAINST CORVEL AND YORK — FRAUD IN VIOLATION OF 18 U.S.C. §§1961, 1962, 1964 and 1965

125.    As set forth in detail above, each of the Plaintiffs suffered a work related injury.

126.    For each Plaintiff, York and CorVel acting in concert with one or more of the enterprises discussed above refused to pay benefits due to the Plaintiffs under California law.

127.    These refusals were supported by fraudulent communications in violation of 18 USC sections 1341, 1343, and 1344 that claimed that the injury was not work-related or otherwise not compensable.

128.   CorVel and York's fraud directly caused injury to Plaintiffs because it deprived them of workers' compensation benefits and because it caused them the expense of paying attorney fees and medical care.   CorVel and York's fraud further caused plaintiff to lose wages and other benefits from the City of Rialto and Stockton, caused injury to credit and caused damages described above.

## IX.   SECOND CAUSE OF ACTION AGAINST CORVEL AND YORK— CONSTRUCTIVE FRAUD

129.   CorVel, York, and Hyde owed Plaintiffs a quasi-fiduciary or confidential duty because CorVel, Hyde, and York controlled the medical and financial benefits for Plaintiffs.

130.   CorVel, York, and Hyde failed to disclose to Plaintiffs material information that CorVel, York, and Hyde owed a duty to disclose to Plaintiffs.

131.   Plaintiffs relied on CorVel's failure to disclose material information

132.   Plaintiffs were directly injured by reason of CorVel's failures to disclose material information.

133.   Defendants conduct was so extreme and outrageous that it is not within the range of activities expected of insurance companies.   Indeed, the acts or motives of Defendants do not constitute a risk reasonably encompassed within the workers' compensation bargain. `

## X.   THIRD CAUSE OF ACTION AGAINST CORVEL AND YORK — FRAUD AND FRAUD IN THE INDUCEMENT

134.   Defendants acted fraudulently as to each representation made to Plaintiffs concerning material facts for the reason they would not have acted and which Defendants knew were false or made recklessly without any knowledge of their truth.   The representations were made with the intention that they be acted upon by Plaintiffs, who relied on those representations, thereby causing injury and damage to Plaintiffs.

135.   Defendants' representations regarding the compensability of Plaintiffs claims were made with the intent of misleading Plaintiffs in relying upon those

representations, and Plaintiffs were justified in relying, and did in fact rely, upon such misrepresentations.

136.    Defendants knew that the statements were false at the time Defendants made the statements and Defendants' misrepresentations were material.

137.    As a direct and proximate result of Defendants' misrepresentations, Plaintiffs were injured as described above.

138.    Defendants conduct was so extreme and outrageous that it is not within the range of activities expected of insurance companies.  In addition, the acts or motives of Defendants do not constitute a risk reasonably encompassed within the workers' compensation bargain.

## XI.    FOURTH CAUSE OF ACTION AGAINST CORVEL AND YORK — VIOLATION OF BUSINESS & PROFESSIONS CODE § 17200

139.    Defendants' scheme of fraudulent misrepresentations and omissions to Plaintiffs constitutes unlawful, unfair, or fraudulent business acts and practices, under what is commonly known as the California Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200 et seq.

140.    Defendants' fraudulent misrepresentations and omissions to Plaintiffs were made in California.  For example, the fraudulent denials of workers' compensation benefits were received by Plaintiffs in the state of California.

141.    As set forth above, Defendants have fraudulently received or retained significant amounts from Plaintiffs, directly and proximately caused by its fraudulent schemes of denying legitimate claims and other practices.

142.    As a result of their conduct described above, Defendants have been and will be unjustly enriched.  Specifically, Defendants have been unjustly enriched by denying and delaying paying legitimate claims for on-the-job injuries.

143.    Plaintiffs, pursuant to California *Business & Professions Code* § 17203, seek an order of this court compelling the Defendants to provide restitution and injunctive

relief calling for Defendants, and each of them, to cease unfair business practices in the future.

**XII.   FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS — UNCONSTITUTIONAL DELAYS OF BENEFITS PURSUANT TO 42 U.S.C. §§1983, 1988**

144.   Plaintiffs bring this claim against CorVel and York, and Mextli Hyde, Tanya Mullins, Paula Fantulin, and Britney Faith, in their individual capacity.

145.   At all times relevant to this case, defendants had an obligation to comply with the due process requirements set forth in the Fifth and Fourteenth Amendments to the United States Constitution. Defendants failed to meet their due process obligations with respect to Plaintiffs.

146.   In committing the acts complained of herein, Defendants acted under color of state law to deprive Plaintiffs of certain constitutionally protected rights under the Fifth and Fourteenth Amendments to the Constitution of the United States including, but not limited to: the right not to be deprived of property without due process of law.

147.   Plaintiffs have a due process right in the expectancy of their benefits for workers' compensation. *See Raditch v. U.S.*, 929 F.2d 478 (9th Cir. 1991). And Plaintiffs established their right to workers' compensation benefits. Defendants did not have any basis to dispute the expectancy of this benefit. Instead, Defendants created a pattern and practice of delaying and denying injured workers' entitlement to workers' compensation benefits because Defendants:

    a.  Failed to conduct a reasonable investigation of the events and facts relating to Plaintiff's claim;

    b.  Failed to timely recognize and acknowledge the nature and extent of Plaintiffs' compensable injury

    c.  Failed to accept the undisputed evidence regarding Plaintiffs' claim;

    d.  Denied the existence and/or extent of injury without the input of competent individuals with appropriate medical training;

e.  Created pretextual reasons to deny and/or delay payment of Plaintiffs' claim and Engaged in an "outcome-driven" approach to the claim;

f.  Ignored and refused to consider information favorable to Plaintiffs' claim for workers' compensation benefits; and

g.  Failed to ensure that the industry's best practices were applied consistently with regard Plaintiffs' claims.

148.  Defendants' acts and omissions include, but are not limited to, the following:

a.  Intentionally denying workers' compensation benefits without a reasonable basis for such denial;

b.  Knowingly terminating workers' compensation benefits without a reasonable basis for such action;

c.  Failing to perform an adequate and reasonable investigation or evaluation to determine whether any termination of benefits was supported by a reasonable basis;

d.  Unreasonably interpreting Defendants' obligations to arbitrarily and capriciously delay, decrease, and deny benefits owed to Plaintiffs;

e.  Abusing the litigation process and procedures as a tool to delay, decrease, and deny benefits owed to Plaintiffs;

f.  Needlessly compelling Plaintiffs through administrative litigation to receive benefits under his workers' compensation insurance policy;

g.  Delaying, decreasing, and denying benefits to Plaintiffs with the intent to cause them to accept a compromised amount of the benefits that should have been due and owing under their workers' compensation insurance policy;

h.  Failing to adopt and implement reasonable standards for investigating and evaluating benefits due to Plaintiffs; and

i.  Placing the financial interests of Defendants above the interests of Plaintiffs.

149.   Through the pattern and practice described above, Defendants consistently delayed property rights owed to each Plaintiff, and instead forced them to attend hearings, medical examinations, depositions, and placed road block after road block in front of injured workers' legal entitlement to benefits.  These delays lasted anywhere from months to years.  Defendants lacked any basis or reason to delay these benefits.

150.   Because the delays were so severe, Defendants deprived Plaintiffs of their statutorily created benefit and thus violated Plaintiffs' due process rights guaranteed by the 14th amendment of the United States Constitution. *See Kraebel v. New York City Department of Housing Preservation & Development*, 959 F.2d 395 (2d Cir. 1992); *Kelly v. Railroad Retirement Board*, 625 F.2d 486 (3d Cir.1980).

151.   As a direct and proximate result of the violation of their constitutional rights by the Defendants, Plaintiffs suffered general and special damages as alleged in this Complaint and are entitled to relief under 42 U.S.C §1983.

## XIII.   SIXTH CAUSE OF ACTION AGAINST CORVEL AND YORK — UNCONSTITUTIONAL DELAYS OF BENEFITS PURSUANT TO 42 U.S.C. §§1983, 1988 –CORPORATE LIABLITY

152.   Plaintiffs' constitutional rights were violated when Defendants delayed Plaintiffs' receipt of their entitled benefits for years without any cause. The Plaintiffs' injuries directly resulted from the deprivation of Plaintiffs' property rights without due process.

153.   Defendants are also liable under 42 U.S.C. § 1983 for failing to supervise and train its adjusters, and for overlooking and covering up its adjuster's misconduct. In addition, the Defendants had a general policy, pattern and/or practice of encouraging adjusters to deny and delay legitimate benefits in order to financially benefit Defendants by maintaining contracts with public entities to adjust workers' compensation benefits. Defendants' failure to supervise or discipline its adjusters' conduct, amounts to a departmental policy of overlooking constitutional violations. The Defendants' failure to supervise and train its adjusters, and the Defendants willful blindness towards the

constitutional violations of its employees, constitute gross negligence and/or deliberate and conscious indifference to people's rights as applied through 42 U.S.C. Sections 1983 and 1988.

154.    Additionally, Defendants may be held liable under 42 U.S.C. § 1983 for constitutional torts that are committed pursuant to a policy, procedure, practice, or custom. Even if the Defendants' practice of overlooking constitutional torts was not authorized by an officially adopted policy, the practice may be so common and well-settled that it fairly represents official policy. *See Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397.

155.    In the present case, the Defendants' formal and informal actions in overlooking, hiding and/or tacitly encouraging adjusters to deny claims that were compensable through its adjusters and claims handlers reflect a policy, practice custom and procedure authorizing and allowing the deprivation through considerable delays of civil rights of Plaintiffs in their property rights.  Consequently, the Defendants are liable for harm caused to others, such as Plaintiffs, as a result of its policies, practices customs and procedures.

156.    Defendants are liable for the constitutional torts of its adjusters because the Defendants sanctioned the following customs, practices, and policies:

a.  Failing to adequately supervise or observe its adjusters and personnel;

b.  Failing to discharge or discipline adjusters who are unfit for duties, as shown by prior actions;

c.  Failure to train its adjusters and personnel;

d.  Encouraging and incentivizing adjusters to deny claims in order to achieve a higher closing ratio and lowering costs;

e.  Adopting a practice where claims adjusters who wrongfully deny benefits, as shown by their prior actions, are allowed to continue in their positions;

f.  Intentionally denying workers' compensation benefits without a reasonable basis for such denial; and

g.  knowingly terminating workers' compensation benefits without a reasonable basis for such action.

157.   At the time each Plaintiff was deprived of their workers' compensation benefits, the adjusters were acting pursuant to an official policy, practice, custom and procedure overlooking and/or authorizing unconstitutional denial of workers' compensation benefits. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 659 (1978)

158.   In addition, the Defendants had a general policy, pattern and/or practice of not disciplining adjusters for their conduct, thereby sanctioning the adjuster's actions, which amounted to a departmental policy of overlooking constitutional violations. Defendants' failure to supervise and train its adjusters, and the City's willful blindness towards the constitutional violations of its employees, constitute gross negligence and/or deliberate and conscious indifference to Plaintiffs' rights including.

159.   By the conduct described above, Defendants acted willfully, wantonly, maliciously oppressively and with conscious disregard for and deliberately indifference to Plaintiffs' constitutional due process rights. By intentionally, delaying and denying Plaintiffs' property rights for workers' compensation benefits, Defendants violated Plaintiffs' clearly established due process guaranteed by the 14th amendment.

160.   As a direct and proximate result of the violation of their constitutional rights by the Defendants, Plaintiffs suffered general and special damages as alleged in this Complaint and are entitled to relief under 42 U.S.C §1983.

161.   The conduct of Defendants was willful, malicious, oppressive and/or reckless, and was of such a nature that punitive damages should be imposed in an amount commensurate with Defendants' wrongful acts.

## XIV.  **PRAYER FOR RELIEF**

Plaintiffs respectfully pray that Plaintiffs have judgment entered against Defendant and for an award of damages as follows:

a.  For compensatory damages for physical pain and suffering, mental and

emotional distress, anxiety, and all other general damages alleged and proved at the time of trial all tripled in accordance with RICO;

      b.     Recovery of expert witness fees;

      c.     Recovery of attorney fees;

      d.     Taxable costs incurred herein;

      e.     Pre- and post-judgment interest;

      f.     punitive damages; and

      g.     for all such other and further relief, at law or in equity, to which Plaintiffs may be entitled.

Respectfully submitted,

**DOYLE RAIZNER LLP**

/s/ Jeffrey Avery

———————————————————

Michael Patrick Doyle (*Pro Hac Vice* pending)
Jeffrey Avery (Cal Bar No. 286873)
**DOYLE RAIZNER LLP**
2402 Dunlavy Street
Houston, Texas 77006
Phone:  713.571.1146
Fax:  713.571.1148
service@doyleraizner.com
*Attorneys for Plaintiffs*

OF COUNSEL:
MASTAGNI HOLSTEDT, PC
1912 I Street
Sacramento, CA 95811
Phone: 877.212.6907
Fax: 916.447.4614

1

2

**JURY DEMAND**

3

4

5

*Plaintiffs hereby demand a trial by jury, a right enshrined in the Constitution of the United States of America and of the State of California and preserved by the sacrifices of many.*

6

/s/ Jeffrey Avery

7

8

JEFFREY AVERY

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28